**DEREK SMITH LAW GROUP, PLLC**
Daniel S. Kirschbaum, Esq.
1 Pennsylvania Plaza, 49th Floor
New York, New York 10119
(212) 587-0760
dsk@dereksmithlaw.com
*Attorneys for Plaintiff, Alexandra Robinson*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDRA ROBINSON,<br><br>                    Plaintiff,<br><br>        v.<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>                    Defendant. | Civil Action No.<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1. Plaintiff Alexandra Robinson claims Defendant violation 42 U.S.C. § 1983, which states

   in pertinent part:

   > Every person who, under color of any statute, ordinance, regulation,
   > custom, or usage, of any State or Territory or the District of Columbia,
   > subjects, or causes to be subjected, any citizen of the United States or other
   > person within the jurisdiction thereof to the deprivation of any rights,
   > privileges, or immunities secured by the Constitution and laws, shall be
   > liable to the party injured in an action at law, suit in equity, or other proper
   > proceeding for redress, except that in any action brought against a judicial
   > officer for an act or omission taken in such officer's judicial capacity,
   > injunctive relief shall not be granted unless a declaratory decree was
   > violated or declaratory relief was unavailable.

   By way of Section 1983, Plaintiff claims Defendant retaliated against her for

   exercising her First Amendment right to petition the government for a redress of

1

grievances; and deprived her of her right to Due Process under the Fourteenth Amendment.

2. Plaintiff also seeks relief from violations of the New York State Whistleblower Law, N.Y. Civ. Serv. Law § 75-b, which provides, "[a] public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes improper governmental action."

3. Plaintiff also seeks to remedy violations of New York Labor Law § 740, which is designed to protect employees who report a violation of the law that "creates and presents a substantial and specific danger to the public health or safety." N.Y.L.L. § 740(2).

4. Plaintiff seeks actual damages, compensatory damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest, and an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the law.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it involves questions of federal law under Section 1983 and the First and Fourteenth Amendments to the United States Constitution.

6. This Court has supplemental jurisdiction over Plaintiff's New York state claims pursuant to 28 U.S.C. § 1367 because they arise out of the same nucleus of operative facts as Plaintiff's federal claims.

7. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the acts or omissions giving rise to Plaintiff's claims occurred in this judicial district and Defendant is subject to personal jurisdiction here.

8. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## **PARTIES**

9. Plaintiff Alexandra Robinson is an adult individual and a citizen of the State of California residing at 1033 Park Meadows Road, Chula Vista, CA 91915. At all relevant times, Ms. Robinson was the Executive Director of the New York City Department of Education's Office of Pupil Transportation. Ms. Robinson was a "public employee" as defined under the New York State Whistleblower Law.

10. Defendant New York City Department of Education ("DOE") is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York for the education of children per the applicable sections of New York State Law. Defendant DOE is headquartered at 52 Chambers Street, New York, NY 10007. DOE is a "public employer" as defined under the New York State Whistleblower Law.

11. At all relevant times, DOE accepted, adopted, acquiesced, and/or otherwise was bound by the actions, omissions, and conduct of its owners, officers, managers, supervisors, employees, and agents, each of whom were acting within the course and scope of their employment with DOE.

12. At all relevant times, DOE had direct knowledge of the facts alleged herein by the direct involvement of its owners, officers, managers, supervisors, employees, and agents, each of whom were acting within the course and scope of their employment with DOE.

## FACTS

13. Ms. Robinson started working at DOE in the position of Executive Director of the Office of Pupil Transportation in December 2011.

14. Beginning in or around 2015, Ms. Robinson reported to her immediate supervisor and the Special Commissioner of Investigation for the New York City School District ("SCI") what she reasonably believed were violations of New York State Law regarding training and certification of bus drivers. Ms. Robinson reasonably believed the violations resulted in imminent and serious dangers to the health and safety of students riding public school buses.

15. Under New York State Law, all public school bus drivers must be approved by the DOE Office of Pupil Transportation prior to commencement of service with DOE. Drivers must meet all requirements under the Federal Law for Commercial Drivers, and Section 156.3 of the Regulations of the Commissioner of Education, Article 19-A of the Regulations of the Commissioner of Motor Vehicles, and additional requirements of the Board of Education, as specified in the contract. Highlights of these requirements are summarized below:

   - **Employment Application**. Drivers must complete a DOE Security Clearance Request and submit a copy of a "Fingerprint Referral Form" with fingerprints taken at an approved DOE site. The driver must also obtain a certification by completing certain paperwork, training and testing, including: a written certification of approval from a School Bus Driver Training Instructor approved by DOE attesting that the candidate has successfully completed all pre-service training requirements; a full a complete abstract of the candidates official vehicle operating records from the New York State Department of Motor Vehicles

4

indicating an S19A Status of Active-School Qualified; copies of the driver's NYS Commercial Driver License (Class B) with a P endorsement a State Commercial Bus "S" Certificate and a Social Security card; a completed Article-19 Bus Driver Application and completed Non-Criminal Fingerprint Transmittal Form; a separate certification including the applicant's name and Social Security number, on letterhead stationery signed by an authorized representative of the contractor attesting that the contractor has investigated, reviewed and approved personally the New York State Department of Motor Vehicle abstract of operating record as well as the training, experience, and references of each applicant, and, to the best of the contractor's knowledge, each candidate is of good moral character, fit, and capable in all respects to perform as a vehicle operator pursuant to any resulting contract; certification that the vehicle operator has successfully passed pre-employment drug and alcohol test in accordance with U.S. Department of Transportation regulations and the New York City Administrative Code, dated no more than sixty (60) days prior to certification; certification that the vehicle operator has successfully completed a physical performance test, dated no more than sixty (60) days prior to certification; within thirty (30) days of application, certification that the vehicle operator has successfully completed an "Article 19-A Biennial Behind the Wheel Road Test"; within sixty (60) days of application, certification that the vehicle operator has successfully completed an "Article 19-A Oral/Written Examination"; certification of completion of the one-hour training course required under PJ's Law; and any other documentation as required in any resulting contract, by Article 19-A standards or as may be required by the Director [or designee (s)] or due to changes in local, state or federal laws, rules or regulations. Additionally, each vehicle operator must be fully competent, thoroughly reliable, and at least twenty-one years of age.  Each vehicle operator must be physically fit and properly qualified by experience, driving record, and training to perform his or her duties.

- **Letters of Reference**. Three (3) letters of character reference must be submitted not earlier than three (3) years from the start of service pursuant to any resulting contract from extant individuals, organizations, firms, and/or agencies not related by blood or marriage to the candidate, which attest to his or her personal character, work record and habits, and extent of experience, if any, in a related transportation field.

- **Fingerprints**. In addition to the DOE security clearance, the contractor must follow the procedures established by the Director for DMV clearance.

- **Medical Examinations and Drug Testing**. Each vehicle operator must submit to an annual examination by a New York State licensed physician who is not the Driver's personal physician and who is authorized by the Driver's employer. The Contractor must report the results of each annual physical examination immediately to the Director on forms approved by the New York State Department of Education and provided by the Office of Pupil Transportation. These forms constitute the medical certificate. Each vehicle Driver must meet the

physical fitness requirements of the New York State Education Department's regulations stated at 8 9A) N.Y.C.R.R. Section 156.3(c) and the New York State Motor Vehicles Commissioner's regulations stated at 15 (A) N.Y.C.R.R.

- **Training**. Every Contractor must comply fully with the regulations of the Commissioner of the State Education Department as stated at 8(A) N.Y.C.R.R. 156.3 (d) (2) pertaining to training and instruction for each Driver utilized pursuant to any resulting contract. At present, the section mandates the following requirements for each driver: each school bus driver employed initially either by a board of education or by any transportation contractor subsequent to July 1, 1973, must have received at least two (2) hours of instruction in school bus safety practices prior to the start of service as an operator; each driver of a vehicle transporting children with disabilities who is initially employed subsequent to January 1, 1976, must have received an additional one (1) hour of instruction concerning the special needs of a disabled child prior to the start of service as an operator; during the first year of employment, each driver must complete the New York State Education Department's School Bus Driver Basic (Thirty Hour) Training Program, which must include two (2) hours of instruction concerning the special needs of a disabled child; all drivers must receive a minimum of two (2) hours of refresher instruction in school bus safety at least twice each year, at sessions to be conducted prior to the first day of school and prior to February first each year; refresher courses for drivers of vehicles transporting children with disabilities must also include instruction relating to the special needs of a disabled child; prior to returning to work, each driver who experiences two or more school bus accidents (i.e., resulting in an injury to any party, a fatality or property damage in excess of $1000) within a two-year period while performing NYCDOE contract service must successfully complete an accident repeater course conducted by a defensive driving specialist as approved by the Director [designee (s)]; if, during the term of any resulting contract or any extensions thereof, OPT requires an independent course of training and instruction and/or written examinations to test the proficiency levels of vehicle operations as an adjunct to New York State Education Department school bus driver instruction and training, each driver will be required to undergo such training, instruction and/or testing; each contractor must utilize instructors approved by the New York State Education Department to conduct training sessions for school bus drivers; all training programs must be approved by the New York State Education Department and the Office of Pupil Transportation before the program is offered; the contractor must certify in writing that each driver has received the appropriate training and instruction as specified in any resulting contract; within two weeks of each driver's completion of each training and/or instruction requirement, the contractor must arrange for delivery to OPT of a written certification signed and dated by a New York State Education Department approved school bus driver instructor to state that the particular requirement has been completed successfully.

16. Ms. Robinson's initial complaints to SCI in 2015 (e.g., SCI Case # 2015-6387) and 2016 (e.g., SCI Case # 2016-7009) were regarding violations of regulations on bus driver certifications and training certificates. For example, Ms. Robinson reported that one company, Bus Drivers R Us Training School, had been illegally selling invalid bus driver certificates (SCI Case # 2015-6387). Ms. Robinson separately complained directly to her initial direct supervisor, Eric Goldstein, and then his replacement, Kevin Moran and met with all the training centers themselves.

17. In response, to the first example, Mr. Goldstein hired a consultant, Pupil Transportation Safety Institute, to review the training centers and provide a report with recommendations to DOE, titled "New York City Department of Education Transportation Services Training Center Review Report." DOE ignored the recommendations completely and SCI closed its investigation.

18. On December 18, 2015, Ms. Robinson reported additional concerns to SCI about invalid training certificates being issued by Bus Drivers R Us Training School:



**Robinson Alexandra (OPT)**                                    Dec 8, 2015 at 11:42:47 AI

To: Piwowarski, Joseph (SCI),  Vance, Ron (SCI)                              SCI
Information received today - Bus Drivers R Us

Good afternoon again –

We received word today that one of our companies (All American – President – Ray Fouche) sent fifty (50) drivers to Bus Driver's R Us (Manuel Ortero) today for 19A examinations:

· 19A is the required testing by DMV to observe and evaluate drivers behind the wheel (BTW).
· This BTW is required to be done one-on-one and either on route or IN A BUS with a physical observe of the driver's skill set and driving techniques
· There is absolutely no way that 50 drivers could be given BTW road tests today within the time frame allotted (we heard that they were going between routes)
· Last time I checked this training center certainly did not have enough on-site or on-staff 19A certified trainers to do an observation on 50 drivers.

I would therefore add this as well to the investigation issues at hand.
Thanks,
Alex

Alexandra H. Robinson, M.Ed., CDPT
Executive Director, Office of Pupil Transportation (OPT)
New York City Department of Education (NYCDOE)
44-36 Vernon Blvd., 6th Floor
Long Island City, NY  11101
718.482.3728    Office
619.846.5888    Cell

19. Through early 2018 Ms. Robinson again told to Mr. Goldstein, as well as Paul Weydig—

the safety director in DOE's Office of Pupil Transportation, who worked for Ms.

Robinson—that drivers were not being properly interviewed, were not being given proper

background checks, and were not being properly fingerprinted prior to getting hired by

DOE. This practice posed an imminent harm to the health and safety of children riding

public school buses.  In response, DOE directed former NYPD detective Eric Reynolds to

conduct pre-employment background checks on drivers. Mr. Reynolds' investigation(s)

was supervised by Ralph Manente who reported to Ms. Robinson. The investigation

confirmed Ms. Robinson's concerns: that DOE had been hiring drivers with serious

criminal records. Ms. Robinson continued to report Mr. Reynolds' findings to her

supervisor, Mr. Goldstein, through early 2018 when DOE removed Mr. Reynolds and other investigators from under Ms. Robinson's supervision and stopped interviewing drivers. In June 2018, DOE chose not to renew Mr. Reynolds' 211 waiver, in retaliation for his investigative findings.

20. Around mid-2017, Ms. Robinson reported bus safety issues to Mr. Weydig and SCI, including defective equipment and non-compliance with mandatory inspections (SCI Case # 2017-5216).

21. In July 2018, DOE rubber-stamped over 700 driver and attendant certification letters using Mr. Reynolds' computerized signature, even though he had not conducted any interviews or signed letters since April. This resulted in worsening of the DOE practice of hiring drivers with serious criminal records, a practice that posed an imminent harm to the health and safety of children riding public school buses.

22. Around September 2018, Ms. Robinson informed her new supervisor, Kevin Moran, about her aforementioned concerns about violations of driver training and certification regulations.

23. On October 23, 2018, Ms. Robinson reported to Mr. Moran, Katherine Rodi (attorney at Office of Special Investigations) and SCI (SCI Case # 2018-7301) additional concerns about DOE accepting invalid driver paperwork, a practice that posed an imminent harm to the health and safety of children riding public school buses:



From: Robinson Alexandra (OPT)
Sent: Tuesday, October 23, 2018 6:50 PM
To: Rodi Katherine G. <KRodi@schools.nyc.gov>
Cc: Moran Kevin <KMoran2@schools.nyc.gov>
Subject: Questionable Driver Paperwork FW: A. Medina Lluveres

Hi Kathy – please see attached and below:  The info is on the driver I mentioned that NYSED called me about:
· Attached are the pieces of paperwork we have for him yet when you look in our driver/attendant system below there is not a "behind the wheel" date listed
· We show that his Physical Performance Test (PPT) was done (attached)  on 9/4 (school started on 9/6) as well as the Physical and the Fall Refresher (all in one day?)
· "DMV" letter attached does not look like real letter (look at another to compare)
· Also, NYSED (PTSI that does the certificates and documents the training) said that the DL# I gave them doesn't match with any S certificate that they have on file
· As suggested I am also forwarding to SCI
Thanks – let me know if you have any questions,
Alex

Alexandra H. Robinson, M.Ed., CDPT
Executive Director, Office of Pupil Transportation (OPT)
New York City Department of Education (NYCDOE)
44-36 Vernon Blvd., 6th Floor
Long Island City, NY 11101
718.482.3728   Office

24. On October 26, 2018, Ms. Robinson reported to Kevin Moran and SCI that she found more confidential records, including hundreds of DMV certificates, in a trash can near Mr. Weydig's desk:



Robinson Alexandra (OPT)Oct 25, 2018 at 2:17:42 AM PDT
To: 'intake@nycsci.org'
SCI Cases
Confidential Records Found

Good Morning –
While moving blue "shredding bins" , we noticed the extreme weight of several  (We dump the blue bins' contents into the locked gray shredding bins routinely). In this case there was a huge number of copies (hundreds) of driver abstracts and personal information that were in blue bins (unlocked) in addition to bulk copies of school bus insurance certificates. I have the papers locked up in envelopes.  These driver records were all printed between 9/21 and 10/17 and I do not think should have been left to be shredded in such a manner AND I'm not sure why this many would've been printed and tossed to begin with.
Please let me know if someone would like to com pick them up.
Thank you,
Alex Robinson

Alexandra H. Robinson, M.Ed., CDPT
Executive Director, Office of Pupil Transportation (OPT)
New York City Department of Education (NYCDOE)
44-36 Vernon Blvd., 6th Floor
Long Island City, NY 11101
718.482.3728   Office

25. Shortly thereafter, in November 2018, SCI confiscated Ms. Robinson's computer hard drive.

26. Around the same time, Ms. Robinson received a subpoena from the FBI regarding any information she had about bus contracts. Ms. Robinson informed the FBI that SCI had confiscated her hard drive, which contained documentation of her concerns about driver credentials, among other things.

27. Around November 20, 2018, Ms. Robinson reported additional concerns about training center violations (threats to health and safety of students) to Mr. Moran who declined to take any action.

28. Around mid-2019, Ms. Robinson responded to a request and provided information to the state Attorney General's office, who had started investigating the issues Ms. Robinson had raised about bus driver training and certifications.

29. In May 2019, DOE draft organizational charts for OPT no longer reflected Ms. Robinson as Executive director.

30. Around the same time, SCI asked Ms. Robinson to meet with them in their offices and interrogated her for the entire day (without a break and only provided her ½ glass of water) regarding DOE's "Navman" GPS.

31. In June 2019, Ms. Robinson met with the FBI at their request and provided additional information about the above concerns. She also informed them that SCI had confiscated her hard drive and had not returned it.

32. In July 2019, Ms. Robinson met with the state Attorney General's office to discuss additional concerns about violations of training center regulations for bus drivers. Ms. Robinson also provided the Attorney General's office with a copy of the Pupil

Transportation Safety Institute report to DOE, titled "New York City Department of

Education Transportation Services Training Center Review Report."

33. On September 16, 2019, in retaliation for the above complaints, SCI publicly released a

defamatory "report" about Ms. Robinson to the press. Upon reading the report, Ms.

Robinson notified Mr. Moran that it was retaliation for her complaints about student

safety:

---

**From:** Robinson Alexandra <ARobinson22@schools.nyc.gov>
**Sent:** Monday, September 16, 2019 1:01 PM
**To:** Moran Kevin <KMoran2@schools.nyc.gov>
**Subject:** Just tried calling

Hi Kevin - I just read this report; as you can imagine I am very upset… this is more than retaliation and hate - it is slander and now on the AP, and will tarnish my entire career. I know you're busy, but the "major" points in this report are not accurate at all.  Will just called me and told me that it will be probably mentioned and to refer to press office which is of course what I would do.
Thanks,
Alex

Alexandra H. Robinson, M. Ed., CDPT
Executive Director, Office of Pupil Transportation (OPT)
New York City Department of Education (NYCDOE)
44-36 Vernon Blvd., 6th Floor
Long Island City, NY  11101
718.482.3708

---

34. On September 19, 2019, Ms. Robinson sent another email to Mr. Moran requesting her

hard drive be returned by SCI, or at the very least that it be preserved, so she could rebut

the false allegations contained in the SCI report:

---

**Subject: SCI Report**

Hi Kevin – As discussed the other day I'm obviously very concerned and upset about the serious defamatory statements and professionally damaging conclusions that were released in SCI's public report this past Monday 9/16/19.  Because this report and its contents are harmful to my reputation, and published with fault and as a result of negligence or malice, I respectfully request that the hard drive that was removed from my office on November 13th, 2018, be returned, or at least, preserved with its contents and documents intact, as well as any other related documents preserved, as this

---

would be something that would be needed to rebut the aforementioned conclusions and subsequent recommendations. In addition, as you know, I was subpoenaed on the Federal Contract case and directed to preserve documents as well; the hard drive that was removed has those necessary documents as well.

Alexandra H. Robinson, M. Ed., CDPT
Executive Director, Office of Pupil Transportation (OPT)
New York City Department of Education (NYCDOE)

35. On September 23, 2019, Ms. Robinson was called to a disciplinary meeting with Mr. Moran and Brian Weekes (Human Resources) regarding the retaliatory and false SCI report. Mr. Moran gave Ms. Robinson a deadline of just 1 week to respond to the report.

36. On September 24, 2019, SCI released another "report" accusing Ms. Robinson of asking for rides to the airport for years.

37. Ms. Robinson asked Mr. Moran to extend the 1-week deadline so she could have reasonable time to respond to both SCI reports (in light of the Jewish holidays that she observed) and Mr. Moran said no.

38. On September 26, 2019, Ms. Robinson was called to a second disciplinary meeting with Mr. Moran and Mr. Weekes regarding the second SCI report about rides to the airport. After the meeting, Ms. Robinson sent them an email stating: "As discussed with both of you today, the report seems personally targeted. The report was conducted because of a call from Eric who was not happy with anything that the investigations unit was doing. Most disgraceful, is the fact that I have, as stated several times, submitted numerous concerns to SCI over the years on real issues I believe effect the safety of children, DOE liability, and potential egregious activity that could impact our students directly yet those issues have never been investigated…I have received a case number on a couple, only one has been investigated (and then subsequently closed)."

39. Also, on September 26, 2019, Ms. Robinson had a second meeting with the FBI, who asked her to explain her thoughts on the SCI reports and provide insight on SCI. Additionally, the FBI requested Ms. Robinson send her responses to both reports directly to them. As requested, on September 27, 2019, Ms. Robinson gave the FBI ample evidence proving the SCI reports were false (including Uber, Lyft, taxi and MTA receipts showing she got herself to the airport on most occasions), which she also sent to Mr. Moran.

40. On October 2, 2019, Ms. Robinson produced additional documentation to the FBI as requested.

41. On October 4, 2019, Ms. Robinson was terminated. She was given three (3) termination letters that provided inconsistent reasons for her termination—thus demonstrating that the reasons given by DOE were pretext for unlawful retaliation:

(continued on following page)

**Letter #1**



**Department of Education**
Chancellor Richard A. Carranza

**DISCIPLINARY LETTER**

Alexandra Robinson
Executive Director, Office of Pupil Transportation
Educational Management Associate
File # 4004708

**Kevin Moran**
Senior Advisor
kmoran2@schools.nyc.gov

52 Chambers Street
New York, NY 10007
917-755-7339

October 4, 2019

Dear Ms. Robinson:

On Thursday, September 26, 2019, Human Resources Director, Brian Weekes and I met with you at 52 Chambers Street to discuss a report issued by the Special Commissioner of Investigation for the New York City School District (SCI) that substantiated misconduct when you requested that subordinate employees use your City-owned vehicle to transport you to area airports, such as the LaGuardia Airport, Newark International Airport and John F. Kennedy International Airport. See the attached report for SCI # 2018-6050.

During the meeting you were provided with a copy of SCI report # 2018-6050.  Once you confirmed that you had reviewed the SCI report, I asked you in sum and substance whether you had anything to say regarding the substantiated report.  In response you indicated in sum and substance that you never directed anyone to provide you with rides to the airport.  You nevertheless admit the following in sum and substance, that over the years your subordinates would offer you a ride if they happened to be going in the direction you were headed.  On September 26, 2019, you later submitted via e-mail a number of documents and e-mails. See the attached.  In the body of your e-mail to me, you further admit to the following:

- On one occasion Joe Valentin picked me up on the way to a Yeshiva meeting that we were both attending
- On one occasion Eden Perez drove me to airport for DOE approved trip and then continued with the use of city car for DOE approved school/yard visits. (sic)

After reviewing your statements, the documentation you submitted to me, along with the SCI report, I agree with the findings of the report, and I conclude you engaged in conduct unbecoming when you took advantage of your position as a public servant to receive a personal benefit, in violation of Chancellor's Regulation C-110 covering Conflicts of Interest. The SCI investigation revealed that for years you used your subordinate staff to drive you to the airport, in your Department issued vehicle, for both personal trips and business trips.  I further conclude that this constitutes a misuse of City resources.

Based on the above referenced substantiated SCI report and another matter that has come to light via another substantiated SCI report, your services are hereby terminated immediately.

Sincerely,

_____          10/4/19
Kevin Moran                                        Date

I received a copy of this letter and understand that it will be placed in my file.

_____          _____
Alexandra Robinson                            Date

Attachments

*AR provided copies of letters. Chose not to sign 10/4*   10/4
*Name* 10/4

**Letter #2**



**Department of Education**
Chancellor Richard A. Carranza

**Kevin Moran**
Senior Advisor
Kmoran2@schools.nyc.gov

52 Chambers Street
New York, NY 10007
917-755-7339

October 4, 2019

**Alexandra Robinson**
**Educational Management Associate**
**EID# 1300731**

Dear Alexandra Robinson:

Effective immediately, you are terminated from the NYC Department of Education.

Please work with Brian Weekes to return any DOE property and to ensure that you are able to retrieve any personal items from 44-36 Vernon Boulevard.

Please be advised that your final check will not be issued until all items have been returned.

Sincerely,

Kevin Moran
Senior Advisor to the Chancellor

cc:
Chancellor Richard Carranza
Tomas Hanna
Brian Weekes
Howard Friedman

Lauren Siciliano
Katherine Rodi
Karen Antoine

16

**Letter #3**



**Department of
Education**
Chancellor Richard A. Carranza

**Kevin Moran**
Senior Advisor
Kmoran2@schools.nyc.gov

52 Chambers Street
New York, NY 10007
917-755-7339

**DISCIPLINARY LETTER**

**Alexandra Robinson**
**Executive Director, Office of Pupil Transportation**
**Educational Management Associate**
**File # 4004708**

October 4, 2019

Dear Alexandra Robinson,

On Monday, September 23, 2019, Human Resources Director, Brian Weekes and I met with you at 52 Chambers Street to discuss a report issued by the Special Commissioner of Investigation for the New York City School District (SCI) that substantiated misconduct against you regarding your mismanagement of city resources, purposeful downplaying of issues involving The Navman Project, the lack of appropriate oversight, accountability, communication, and the lack of employee(s) with the technical abilities to oversee the project. See the attached report for SCI # 2019-0431.

During the meeting you were provided with a copy of SCI report # 2019-0431 with the opportunity to review. Once you confirmed that you had reviewed the SCI report, I asked you in sum and substance whether you had anything to say regarding the substantiated report. In response you submitted via e-mail a number of documents and e-mails on September 27, 2019. See the attached.

After reviewing your statements, the documentation you submitted to me, along with the SCI report, I agree with the report, and I conclude you engaged in conduct unbecoming, exhibited a lack of interest in fully executing your responsibilities as the Executive Director of Office of Pupil Transportation (OPT) and gross neglect of duty in failing to properly oversee a major multimillion dollar project for the New York City Department of Education (Department). Your actions and/or inaction contributed to millions of unnecessary costs to the Department.

When confronted with the substantiated SCI report, your responses showed no remorse or even an attempt to reflect on how your actions, if executed differently, could have had a more positive result for the Department. Instead, you shifted blame towards others. I believe that you must take ownership of your failure to oversee OPT's role in The Navman Project. The oversight and management of the project required OPT, under your direct leadership, to coordinate and communicate effectively across the Department. You were in a key position to ensure, on behalf of the Department, that the project went well, and to directly address or escalate instances when the project did not go well so that the Department could protect its interests.

Based on the above referenced substantiated SCI report, your services are hereby terminated immediately.

Sincerely,

Kevin Moran

_10/4/19_
Date

I received a copy of this letter and understand that it will be placed in my file.

Alexandra Robinson

Date

**Attachments**

AR provided copies of letters. Chose not to sign    10:14
10/4
Hann

42. The above are just some examples of the unlawful retaliation to which Defendant

subjected Plaintiff as a result of her various complaints about Defendant's violations of

law.

**Count I**
**New York Civil Service Law – Whistleblower Retaliation**
**N.Y. Civ. Serv. Law § 75-b**

43. Plaintiff incorporates by reference each and every allegation made in the above

paragraphs of this complaint.

44.  The New York State Whistleblower law provides "[a] public employer shall not dismiss

or take other disciplinary or other adverse personnel action against a public employee

regarding the employee's employment because the employee discloses to a governmental

body information: (i) regarding a violation of a law, rule or regulation which violation

creates and presents a substantial and specific danger to the public health or safety; or (ii)

which the employee reasonably believes to be true and reasonably believes constitutes

improper governmental action. "Improper governmental action" shall mean any action by

a public employer or employee, or an agent of such employer or employee, which is

undertaken in the performance of such agent's official duties, whether or not such action

is within the scope of his employment, and which is in violation of any federal, state or

local law, rule or regulation." N.Y. Civ. Serv. Law § 75-b.

45. At all relevant times, Ms. Robinson was a public employee protected under the New

York Civil Service Law's whistleblower protection provision. See N.Y. Civ. Serv. Law §

75-b.

46. Ms. Robinson's October 4, 2019 termination constituted an adverse personnel action (an

action affecting compensation, appointment, promotion, transfer, assignment,

18

reassignment, reinstatement or evaluation of performance) under the New York Civil Service Law's whistleblower protection provision.

47. Beginning in 2015 and 2019, Ms. Robinson disclosed to various government bodies (e.g., SCI, FBI, New York Attorney General) evidence she reasonably believed to be true and improper government action by DOE regarding violations of laws governing training and certification of school bus drivers, which created a substantial and immediate danger to the health and safety of students.

48. Prior to disclosing, Ms. Robinson made a good faith effort to provide her employer, DOE, with the information to be disclosed and gave the employer reasonable time to correct the activities, policies, and practices at issue. Additionally, with each report to a government body, Ms. Robinson had a reasonable belief that there was an imminent and serious danger to public health and safety.

49. DOE would not have terminated Ms. Robinson's employment but for her protected activity of reporting violation of law to a government body.

50. Ms. Robinson will rely on a broad array of evidence to demonstrate a causal link between their protected activity and Defendant's actions taken against her, such as the unusually-suggestive proximity in time between events, Defendant's antagonism and change in demeanor toward Plaintiff after Defendant became aware of her protected activity, and Defendant's inconsistent reasons for terminating Plaintiff's employment.

51. Ms. Robinson claims unlawful discharge and also seeks reinstatement of her position, benefits and seniority.

52. As a direct result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering,

inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible. Plaintiff has been forced to seek ongoing medical treatment including mental health counseling and prescription medication to treat her emotional distress. Prior to events complained of in this case, Plaintiff had no history of mental health intervention, psychotropic treatment or any other history of outpatient counseling. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition(s).

**WHEREFORE** Plaintiff Alexandra Robinson demands judgment against Defendant for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the New York State Whistleblower Law.

<u>**Count II**</u>
**New York Labor Law 740 – Whistleblower Retaliation**
<u>**N.Y.L.L § 740**</u>

53. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

54. N.Y.L.L § 740 prohibits an employer from taking retaliatory action against an employee because such employee:

> (a) discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety, or which constitutes health care fraud;

(b)  provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such violation of a law, rule or regulation by such employer;  or

(c) objects to, or refuses to participate in any such activity, policy or practice in violation of a law, rule or regulation.

55. At all relevant times, Ms. Robinson was a public employee protected under N.Y.L.L §

740 whistleblower protection provision.

56. Ms. Robinson's October 4, 2019 termination constituted an adverse personnel action (an

action affecting compensation, appointment, promotion, transfer, assignment,

reassignment, reinstatement or evaluation of performance) under the N.Y.L.L § 740

whistleblower protection provision.

57. Beginning in 2015 and 2019, Ms. Robinson disclosed to various government bodies (e.g.,

SCI, FBI, New York Attorney General) evidence she reasonably believed to be true and

improper government action by DOE regarding violations of laws governing training and

certification of school bus drivers, which created a substantial and immediate danger to

the health and safety of students.

58. Prior to disclosing, Ms. Robinson made a good faith effort to provide her employer,

DOE, with the information to be disclosed and gave the employer reasonable time to

correct the activities, policies, and practices at issue. Additionally, with each report to a

government body, Ms. Robinson had a reasonable belief that there was an imminent and

serious danger to public health and safety.

59. DOE would not have terminated Ms. Robinson's employment but for her protected

activity of reporting violation of law to a government body.

60. Ms. Robinson will rely on a broad array of evidence to demonstrate a causal link between

their protected activity and Defendant's actions taken against her, such as the unusually-

suggestive proximity in time between events, Defendant's antagonism and change in demeanor toward Plaintiff after Defendant became aware of her protected activity, and Defendant's inconsistent reasons for terminating Plaintiff's employment.

61. Ms. Robinson claims unlawful discharge and also seeks reinstatement of her position, benefits and seniority.

62. As a direct result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible. Plaintiff has been forced to seek ongoing medical treatment including mental health counseling and prescription medication to treat her emotional distress. Prior to events complained of in this case, Plaintiff had no history of mental health intervention, psychotropic treatment or any other history of outpatient counseling. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition(s).

**WHEREFORE** Plaintiff Alexandra Robinson demands judgment against Defendant for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and declaration that Defendant's conduct as set forth herein is in violation of the New York State Whistleblower Law.

**Count III**
**Deprivation of Due Process**
**42 U.S.C. § 1983**

63. Plaintiff incorporates by reference each and every allegation made in the above

paragraphs of this complaint.

64. Plaintiff claims Defendants violated 42 U.S.C. § 1983, which states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought against a judicial
> officer for an act or omission taken in such officer's judicial capacity,
> injunctive relief shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable.

42 U.S.C. § 1983.

65. The Fourteenth Amendment of the United States Constitution states in relevant

part that "All persons born or naturalized in the United States, and subject to the

jurisdiction thereof, are citizens of the United States and of the State wherein they

reside. No State shall make or enforce any law which shall abridge the privileges

or immunities of citizens of the United States; nor shall any State deprive any

person of life, liberty, or property, without due process of law; nor deny to any

person within its jurisdiction the equal protection of the laws.

66. The Due Process Clause of the Fourteenth Amendment to the United States

Constitution prohibits Defendants from depriving any person of life, liberty, or

property without due process of law.

67. Defendants did not provide Plaintiff with a hearing and thus due process under the

law.

68. As a result, Plaintiff lost employment, as well as an express or implied promise of continued employment.

69. Defendant violated Plaintiff's constitutional rights as set forth herein, including but not limited to Due Process. Defendants violated the above section as set forth herein.

70. Moreover, this case unquestionably involves official policy: Defendant and its policymaking officials (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

71. As a direct result of Defendant's unlawful conduct, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible. Plaintiff has been forced to seek ongoing medical treatment including mental health counseling and prescription medication to treat her emotional distress. Prior to events complained of in this case, Plaintiff had no history of mental health intervention, psychotropic treatment or any other history of outpatient counseling. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition(s).

**WHEREFORE** Plaintiff Alexandra Robinson demands judgment against Defendant for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and

declaration that Defendant's conduct as set forth herein is in violation of the New York State Whistleblower Law.

**Count IV**
**Retaliation in violation of Petition Clause**
**42 U.S.C. § 1983**

72. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

73. The First Amendment gives persons the right to petition the Government for a redress of grievances. U.S. Const. amend. I.

74. "[R]etaliation by a government employer for a public employee's exercise of the right of access to the courts may implicate the protections of the Petition Clause." Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2494 (2011).

75. To be protected under the First Amendment, speech by a government employee "must be on a matter of public concern, and the employee's interest in expressing herself on this matter must not be outweighed by any injury the speech could cause to 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Waters v. Churchill, 511 U.S. 661, 668 (1994).

76. Here, Plaintiff engaged in activity that was protected by the First Amendment's Petition Clause.

77. Plaintiff's speech was on a matter of public concern.

78. Defendant took materially adverse employment actions against Plaintiff for engaging in protected activity.

79. Plaintiff's protected activity was a substantial or motivating factor in Defendant's decisions.

80. Defendant cannot show any legitimate nondiscriminatory reason for its employment practices and any reasons proffered by Defendant for their actions against Plaintiff are pretextual and can readily be disbelieved.

81. Defendant acted upon a continuing course of conduct.

82. Moreover, this case unquestionably involves official policy: Defendant and its policymaking officials (1) directed that the violations occur; (2) authorized the violations; (3) agreed to subordinates' decisions to engage in the violations; (4) provided inadequate training; (5) provided inadequate supervision; and (6) failed to adopt needed policies to prevent the violations.

83. As a direct result of Defendant's unlawful conduct, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible. Plaintiff has been forced to seek ongoing medical treatment including mental health counseling and prescription medication to treat her emotional distress. Prior to events complained of in this case, Plaintiff had no history of mental health intervention, psychotropic treatment or any other history of outpatient counseling. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition(s).

**WHEREFORE** Plaintiff Alexandra Robinson demands judgment against Defendant for actual damages, compensatory damages, punitive damages, back pay, front pay, reinstatement, attorneys' fees, litigation costs, pre- and post-judgment interest; as well as an adjudication and

declaration that Defendant's conduct as set forth herein is in violation of the New York State Whistleblower Law.

## Count V
### Declaratory Relief Allegations

84. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

85. A present and actual controversy exists between Plaintiff and Defendant concerning their rights and respective duties.

86. Plaintiff contends Defendant violated her rights as complained of herein.

87. Plaintiff is informed and believes that Defendant denies these allegations.

88. Declaratory relief is therefore necessary and appropriate.

**WHEREFORE**, Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

## Count VI
### Injunctive Relief Allegations

89. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

90. No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs addressed herein.

91. If this Court does not grant the injunctive relief sought, Plaintiff will be irreparably harmed.

**WHEREFORE**, Plaintiff seeks an order enjoining Defendant from engaging in the unlawful acts complained of herein.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues raised by this complaint.

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

*/s/ Daniel S. Kirschbaum, Esquire*
DANIEL S. KIRSCHBAUM
Dated: <u>October 1, 2020</u>                    *Attorneys for Plaintiff, Alexandra Robinson*