UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X
                                   :

ALEXANDRA ROBINSON,          :
                                   :

                     Plaintiff,   :

                                   :

         - against -           :

                                   :

THE NEW YORK CITY DEPARTMENT OF :
EDUCATION,                      :

                                   :

                  Defendant.  :

                                   :

----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/22/2021__

20-CV-8175 (VSB)

**OPINION & ORDER**

Appearances:

Ian M. Bryson
Derek Smith Law Group, PLLC
New York, NY
*Counsel for Plaintiff*

Aliza J. Balog
Corporation Counsel of the City of New York
New York, NY
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

        Plaintiff Alexandra Robinson ("Plaintiff") brings this action for whistleblower retaliation

pursuant to the New York State Civil Service Law, N.Y. Civ. Serv. Law § 75-b, and the New

York Labor Law § 740, and for violation of her First and Fourteenth Amendment rights under

the United States Constitution, pursuant to 42 U.S.C. § 1983, against Defendant New York City

Department of Education, ("Defendant" or "DOE").  Before me is DOE's motion to dismiss

Plaintiff's complaint.  (Doc. 9.)  Because I find that Plaintiff has failed to plausibly plead a

violation of her constitutional rights, and because I decline to exercise supplemental jurisdiction

over her state law claims, DOE's motion is GRANTED.

I.    **Factual Background**[1]

Plaintiff is a California resident who, at all relevant times, was Executive Director of DOE's Office of Pupil Transportation ("OPT").  (Compl. ¶ 9.)[2]  Plaintiff held this position at DOE beginning in December 2011.  (*Id.* ¶ 13.)  In or around 2015, Plaintiff reported to her immediate supervisor and the Special Commissioner of Investigation for the New York City School District ("SCI") what she believed to be violations of state law regarding the certification and training of public school bus drivers.  (*Id.* ¶ 14.)  Under state law, OPT must approve all public school bus drivers before they begin working with DOE.  (*Id.* ¶ 15.)  Under state law, to qualify for OPT approval and to work for DOE, bus drivers must, at a minimum:

- complete an employment application, including a security clearance request and several examinations;
- provide three letters of reference;
- undergo medical examinations and drug testing; and
- comply with prevailing regulations with regard to training and instruction.

(*Id.*)  Robinson filed complaints with SCI in 2015 and 2016 alleging some violations related to bus driver certifications and training certificates, including an allegation that one private company, Bus Drivers R Us Training School, was selling invalid bus driver certificates.  (*Id.* ¶ 16.)  Plaintiff also complained directly to her initial direct supervisor Eric Goldstein ("Goldstein") and his successor Kevin Moran ("Moran"), and met with the training centers.  (*Id.*) In response, Goldstein hired the Pupil Transportation Safety Institute, an outside consultant, to review the training centers, which ultimately submitted a report with recommendations to DOE.

---

[1] The facts set forth herein are taken from the allegations contained in the Complaint.  (Doc. 1.)  I assume Plaintiff's allegations in the Complaint to be true for purposes of this motion.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  However, my reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Compl." Refers to Plaintiff's Complaint filed on October 1, 2020.  (Doc. 1.)

(*Id.* ¶ 17.)  DOE took no action on the report and SCI closed the investigation.  (*Id.*)  On December 18, 2015, Plaintiff submitted an email to two SCI employees raising additional concerns about Bus Drivers R Us' practices, stating that "[t]here is absolutely no way that 50 drivers could be given . . . road tests today within the timeframe allotted."  (*Id.* ¶ 18.)  In mid-2017, Plaintiff submitted a complaint to SCI and Paul Weydig ("Weydig"), a safety officer in OPT and an employee supervised by Plaintiff, about defective equipment on public school buses and non-compliance with mandatory inspections.  (*Id.* ¶ 20.)  An investigation by Eric Reynolds ("Reynolds"), a former police detective hired by DOE after Plaintiff's complaints, confirmed that DOE had hired "drivers with serious criminal records."  (*Id.* ¶ 19.)  Through early 2018, Plaintiff told Golstein and Weydig that DOE was not properly vetting its drivers, which was unlawful and a threat to public safety.  (*Id.*)  In the first half of 2018, DOE removed investigators from Plaintiff's supervision, stopped interviewing drivers, and chose not to retain Reynolds.  (*Id.*)

In July 2018, DOE approved more than 700 driver and attendant certification letters using Reynolds' signature, even though he had not reviewed applications since April 2018, leading to the hiring of more bus drivers with criminal records.  (*Id.* ¶ 21.)  Around September 2018, Robinson informed Moran, who had become her new supervisor, about her concerns about the driver training and certification issues she had previously raised.  (*Id.* ¶ 22.)  On October 23, 2018, Plaintiff informed Moran and SCI about additional concerns she had about DOE accepting invalid driver paperwork.  (*Id.* ¶ 23.)  Three days later, she reported to Moran and SCI that she had found hundreds of certificates from the New York Department of Motor Vehicles ("DMV") and more confidential records in a trash bin near Weydig's desk.  (*Id.* ¶ 24.)  In November 2018, SCI confiscated Plaintiff's hard drive.  (*Id.* ¶ 25.)  Around this time, Plaintiff received a subpoena from the FBI regarding information she had about bus contracts; Plaintiff told the FBI

that SCI had confiscated her hard drive, which contained important information it.  (*Id.* ¶ 26.)
Around November 20, 2018, Plaintiff reported more concerns about training center violations to
Moran, who took no action.  (*Id.* ¶ 27.)

      Around mid-2019, Plaintiff provided information to the New York State Attorney
General ("NYAG") in response to a request she received about NYAG's investigation into the
bus driver training and certification issue.  (*Id.* ¶ 28.)  In May 2019, DOE drafted new
organizational charts in which Plaintiff was not listed as Executive Director of OPT.  (*Id.* ¶ 29.)
Around this time, Plaintiff met with SCI at the latter's request, and SCI asked her questions for a
full day.  (*Id.* ¶ 30.)  In June 2019, Plaintiff met with the FBI at the latter's request regarding bus
driver training and certifications, and informed the FBI that SCI had not returned her confiscated
hard drive.  (*Id.* ¶ 31.)  The next month, Plaintiff met with NYAG officials to discuss more
concerns about violations of training center regulations for bus drivers.  (*Id.* ¶ 32.)

      On September 16, 2019, SCI publicly released a report about Plaintiff to the press; that
day, Plaintiff emailed Moran, telling him that the report was "not accurate at all," and constituted
"retaliation and hate" and "slander."  (*Id.* ¶ 33.)  Three days later, Plaintiff emailed Moran to
request that SCI return her hard drive.  (*Id.* ¶ 34.)  On September 23, 2019, Plaintiff met with
Moran and a human resources officer, where Moran gave Plaintiff a week to respond to the
report.  (*Id.* ¶ 35.)  The next day, SCI released another report, this time accusing Plaintiff of
"asking for rides to the airport for years."  (*Id.* ¶ 36.)  Plaintiff asked Moran for an extension of
the one-week deadline to respond to the initial press report in light of the Jewish holidays; Moran
declined.  (*Id.* ¶ 37.)  On September 26, 2019, Plaintiff again met with Moran and the same
human resources officer.  (*Id.* ¶ 38.)  After that meeting, Plaintiff emailed them stating that the
second SCI report "seems personally targeted" and that it was "disgraceful" that her "numerous

concerns to SCI over the years . . . have never been investigated." (*Id.*) That same day, Plaintiff

met with the FBI about the SCI reports, where the FBI requested that she send her responses to

the reports directly to them. (*Id.* ¶ 39.) She sent those responses both to the FBI and Moran, and

sent additional documentation to the FBI on October 2, 2019. (*Id.* ¶¶ 39–40.)

Plaintiff was terminated from her job on October 4, 2019. (*Id.* ¶ 41.) On that day, she

was sent three separate letters signed by Moran. The first letter notes that an SCI report

"substantiated misconduct when you requested that subordinate employees use your City-owned

vehicle to transport you to area airports." (*Id.*) The first letter states that while Plaintiff claims

that she "never directed anyone to provide [her] with rides to the airport," she "nevertheless

admit[ted] . . . that over the years your subordinates would offer you a ride if they happened to be

going in the direction you were headed." (*Id.*) The letter also states that Plaintiff provided two

specific examples of this behavior. (*Id.*) Moran "conclude[d] [Plaintiff] engaged in conduct

unbecoming when [she] took advantage of [her] position as a public servant to receive a personal

benefit," and "misuse[d] . . . City resources" by "us[ing] [her] subordinate staff to drive [her] to

the airport" for a matter of years. (*Id.*)

In the second letter, Moran stated that Plaintiff's employment was terminated "[e]ffective

immediately," directed her to return all DOE property, and informed her that she would not

receive her final pay check until all DOE property was returned. (*Id.*) In the third letter, Moran

noted that Plaintiff "engaged in conduct unbecoming" because she "exhibited a lack of interest in

fully executing [her] responsibilities as the Executive Director of [OPT] and gross neglect of

duty in failing to properly oversee a major multimillion dollar project for [DOE.]." (*Id.*)

Moran's third letter further stated that Plaintiff's responses to the SCI reports "showed no

remorse or even an attempt to reflect on how your actions, if executed differently, could have

had a more positive result for [DOE]," and that Plaintiff instead "shifted blame towards others."

(*Id.*)  The third letter references Plaintiff's role in overseeing The Navman Project.[3]  (*Id.*)

## II.    **Procedural History**

Plaintiff initiated this action by filing her Complaint on October 1, 2020.  (Compl.)  In

her complaint, Plaintiff alleged two counts of whistleblower retaliation under New York law, one

count under the Due Process Clause of the Fourteenth Amendment to the United States

Constitution, and one count of retaliation in violation of the Petition Clause of the First

Amendment to the United States Constitution.  (*Id.*)  On December 21, 2020, DOE filed a motion

to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), along with

a memorandum of law, a declaration, and several exhibits.  (Docs. 9–11.)  The following day, I

issued an order instructing Plaintiff that she could amend her complaint as a matter of course on

or before January 18, 2021 pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), and that it

would be "unlikely that Plaintiff will have a further opportunity to amend."  (Doc. 22.)  In that

order, I also set out a briefing schedule for DOE's motion to dismiss in the event that Plaintiff

chose not to amend her Complaint.  (*Id.*)  Plaintiff did not amend her Complaint, and instead

filed a memorandum of law, declaration, and exhibits in opposition to DOE's motion to dismiss

on January 27, 2021.  (Docs. 13–14.)  This motion became fully briefed when DOE filed its

reply memorandum of law on February 10, 2021.  (Doc. 15.)

---

[3] The Navman Project was also referenced earlier in the Complaint, (*see* Compl. ¶ 30), but never explained. According to a report issued by SCI in September 2019 "[f]rom April 27, 2015 to September 11, 2019, the DOE paid $8,660,146.00 to contracted vendor Navman Wireless (d/b/a Teletrac Navman, hereafter 'Navman') for electronically providing student tracking information, in part to assist the DOE in claiming Medicaid reimbursement for transportation."  (Doc. 11-1, at 2.)  The report concluded that Navman did not fulfill the terms of the contract and as a result that "no money—none—was ever reimbursed to the DOE for Medicaid reimbursement for transportation, which was the original purpose of the contract."  (*Id.*)

### III.   **Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*  This standard demands "more than a sheer possibility that a defendant has acted unlawfully."   *Id.*  "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable."   *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor.   *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).  A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."   *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).   Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."   *Id.*

A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."   *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

IV.   **Discussion**

    A.   *Monell Claim*

To succeed on a section 1983 claim, "a plaintiff must allege that [she] was injured either by a state actor or a private party acting under color of state law." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).  A municipality or local government is liable under section 1983 "if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (internal quotation marks omitted).  Local governments are not vicariously liable under section 1983, and instead are responsible only for their own illegal acts. *Id.*  "A municipality may, however, be liable under § 1983 when the alleged deprivation of constitutional rights is the result of action pursuant to an official municipal policy, or the municipality exhibits deliberate indifference to the possibility of such a constitutional violation." *Williams v. City of N.Y.*, 690 F. Supp. 2d 338, 343 (S.D.N.Y. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Vann v. City of N.Y.*, 72 F.3d 1040, 1049 (2d Cir. 1995)).  In addition, "the deprivation of the plaintiff's rights [must be] caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. at 690–91).  The municipality must have been the "moving force" behind the alleged injury. *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted).

"[I]solated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Jones*, 691 F.3d at 81.  However,

> such acts would justify liability of a municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or

usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses.

*Id.*   At the pleading stage, a plaintiff "must give a factual description of such a policy, not just bald allegations that such a thing existed." *Bess v. City of N.Y.*, 11 Civ. 7604(TPG), 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013).

Plaintiff's Complaint does not adequately plead a *Monell* violation for two main reasons. First, Plaintiff fails to provide any non-conclusory allegations that any of the DOE employees mentioned or at least referenced in the Complaint had final policymaking authority. "Only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotation marks omitted). Plaintiff's Complaint twice uses the same conclusory allegation, referring to "Defendant and its policymaking officials," (Compl. ¶¶ 70, 82), but there are no actual factual allegations suggesting who these policymaking officials are, what actions they took during the relevant time period that impacted Plaintiff, and to what extent they had actual policymaking authority.

Second, Plaintiff does not adequately allege that DOE has a policy, custom, or usage of terminating the employment of employees for retaliatory reasons. The only allegation in Plaintiff's Complaint that relates to anyone other than her is that, in June 2018, "DOE chose not to renew [Reynolds'] 211 waiver, in retaliation for his investigative findings." (Compl. ¶ 19.) However, Plaintiff does not provide any factual allegations to support her conclusory statement that Reynolds was fired in retaliation, (*see id.*), nor does she provide any examples of other employees who were retaliated against for speaking out against DOE. As such, Plaintiff's argument that DOE had a "custom of retaliation" is unavailing because she does not provide any non-conclusory factual allegations that any other individuals were retaliated against for

whistleblowing.  *See generally Peterson v. City of N.Y.*, No. 10 Civ. 7283, 2018 WL 5811432, at *5–6 (S.D.N.Y. Nov. 6, 2018) (finding that "an official's single decision to alter an employee's position does not somehow create a municipal policy or custom," and that "an employment decision in regard to one person is a personnel decision and nothing more") (internal quotation marks omitted).

To the extent that Plaintiff is also arguing that DOE had a policy or custom of unlawful training, certification, and hiring of bus drivers, (*see* Doc. 13, at 13–14), this argument must also fail.  Plaintiff cannot establish *Monell* liability under this theory because "*Monell* prohibits a finding of liability" where a plaintiff has failed to establish "a causal link between an official policy or custom and the [plaintiff's] injury."  *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).  DOE's policy or custom of unlawfully hiring and training bus drivers, if any existed, did not directly cause Plaintiff's injury here.  Rather, Plaintiff must adequately allege that DOE had a policy or custom of retaliating against whistleblowers or those who spoke out against DOE practices.  On this latter point, as noted *supra*, Plaintiff's Complaint has few, if any, non-conclusory allegations that go beyond her own personal circumstances.

As such, both of Plaintiff's constitutional claims must fail because she does not adequately allege *Monell* liability.  Nevertheless, I move to address the merits of Plaintiff's constitutional claims and find that her claims also fail on the merits and alternatively could be dismissed on those grounds, as well.

### B.  *First Amendment Retaliation*

"To establish First Amendment retaliation by a government actor, the plaintiff must demonstrate that (1) his or her speech or conduct was protected by the First Amendment; (2) the

defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech." *Agosto v. N.Y.C Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020) (internal quotation marks omitted).  There is no question that Plaintiff satisfies the second element of the test since "[t]ermination also obviously qualifies as an adverse employment action." *Morris v. Lindau*, 196 F.3d 102, 111 (2d Cir. 1999).  Plaintiff plausibly pleads, and DOE acknowledges, (Doc. 10, at 6–7), that DOE terminated Plaintiff's employment on October 4, 2019.

However, Plaintiff's First Amendment retaliation claim must be dismissed because she has not plausibly pled either of the first or third elements.  "When the plaintiff is a government employee, the first element is satisfied only if the employee spoke as a private citizen and . . . the speech at issue addressed a matter of public concern—that is, the speech must be fairly considered as relating to any matter of political, social, or other concern to the community and be of general interest or of legitimate news interest." *Agosto*, 982 F.3d at 95 (internal quotation marks omitted).  The Supreme Court has not "articulate[d] a comprehensive framework for defining the scope of an employee's duties" when determining whether an employee speaks as a "citizen" or as a public employee for purposes of this analysis.  *Garcetti v. Cellabos*, 547 U.S. 410, 424 (2006); *see also Matthews v. City of N.Y.*, 779 F.3d 167, 173 (2d Cir. 2015) ("[W]hether a public employee is speaking pursuant to her official duties is not susceptible to a brightline rule.") (internal quotation marks omitted).  However, in this District, "courts consider several factors when attempting to determine if a public employee spoke pursuant to his official duties, including:  (1) the plaintiff's job description; (2) the persons to whom the speech was directed; (3) whether the speech resulted from special knowledge gained through the plaintiff's employment; (4) whether the speech occurs in the workplace; and (5) whether the speech

concerns the subject matter of the employee's job." *Airday v. City of N.Y.*, 131 F. Supp. 3d 174, 180 (S.D.N.Y. 2015).

As to the speech alleged in the Complaint, it is not hard to determine that Plaintiff was speaking pursuant to her official duties and not as a private citizen.  All the speech at issue in this litigation are complaints related to conduct that Plaintiff "believed were violations of New York State Law regarding training and certification of bus drivers," (Compl. ¶ 14)—speech that is directly related to Plaintiff's job as Executive Director of OPT and her responsibility to ensure that public school bus drivers met the requisite qualifications under state law.  With the exception of her conversations with the FBI and NYAG—conversions that came much later in the relevant time period—Plaintiff directed all her complaints to SCI or her fellow employees at DOE.  (*See, e.g.*, *id.* ¶¶ 16, 18–24, 27.)  It is also clear that Plaintiff's complaints resulted from special knowledge she gained from her unique position as Executive Director of OPT.  Plaintiff's Complaint demonstrates that she had a thorough and detailed understanding of DOE's legal requirements when approving public school bus drivers.  (*See id.* ¶ 15.)  In one email, she stated, based on what can only be described as her expertise, that Bus Drivers R Us could not have possibly trained 50 drivers "within the time frame allotted." (*Id.* ¶ 18.)  Her complaints were largely informed by extremely specialized knowledge gleaned from her job—such as the fact that "drivers were not being properly interviewed, were not being given proper background checks, and were not being properly fingerprinted prior to getting hired by DOE." (*Id.* ¶ 19.)  At one point, Plaintiff even made a complaint after purportedly seeing certain confidential materials in her colleague's wastebasket in the DOE offices.  (*Id.* ¶ 24.)

In response, Plaintiff argues only that "Plaintiff's testimony to the FBI and [NYAG] in response to their subpoenas are . . . outside the scope of her ordinary job duties." (Doc. 13, at

19–20.)  This may indeed be true but (1) Plaintiff was only speaking to the FBI and NYAG based on her specialized knowledge of DOE and OPT matters, and (2) her testimony to the FBI and NYAG constitutes only a small portion of the speech at issue, the bulk of which was made directly to DOE and SCI employees within the scope of her employment.  Plaintiff does not address the core problems for her First Amendment retaliation claim:  (1) that her speech was central to her employment responsibilities to oversee training and certification for public school bus drivers, and (2) that she knew about the issues in question because of the specialized knowledge she gained through her employment position.  Plaintiff was in no way speaking as an ordinary citizen; therefore, she cannot satisfy the first element.

Further, Plaintiff's First Amendment retaliation claim must also fail because she has not plausibly plead a causal connection between the termination of her employment and the protected speech at issue.  "On a motion to dismiss, a reasonable inference of a causal connection is all that is required."  *Gonzalez v. City of N.Y.*, 377 F. Supp. 3d 273, 295 (S.D.N.Y. 2019).  "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999).

Here, Plaintiff first argues that between 2015 and 2019, she "disclosed to various governmental bodies . . . evidence she reasonably believed to be true and improper government action by DOE."  (Doc. 13, at 16.)  This is true, but Plaintiff does not properly distinguish between the various governmental bodies at issue.  Given that DOE terminated Plaintiff's employment, this inquiry turns on DOE's knowledge of Plaintiff's protected speech.  There are no allegations in the Complaint that DOE knew about Plaintiff's meetings with the FBI or NYAG or what she said in those meetings.  The last known complaint of which any DOE

13

employee was aware was made on November 24, 2018, (Compl. ¶ 27 ("Around November 20, 2018, Ms. Robinson reported additional concerns about training center violations (threats to health and safety of students) to Mr. Moran who declined to take any action."))—more than ten months before Plaintiff's employment was terminated, (*see id.* ¶ 41).

I note as a preliminary matter that cases holding that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (internal quotation marks omitted). As Plaintiff makes clear in her Complaint, (*see* Compl. ¶ 16), and opposition brief, (*see* Doc. 13, at 16), Plaintiff first brought her complaints to DOE's attention sometime in 2015. As such, given that Plaintiff was terminated on October 4, 2019, the temporal proximity between DOE's knowledge and her termination was at least four years—far more than acceptable in the Second Circuit. *See infra*.

However, I find that even if I measure temporal proximity based on when Plaintiff made her last complaint to DOE, this length of time of more than ten months is too attenuated to establish a reasonable inference of causation. It is true that the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," and has "previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). However, "district courts within the Second Circuit consistently have found that lapses of more than two or three months between protected activity and allegedly retaliatory actions do not support inferences of causation." *Smith v. Da Ros*, 777 F. Supp. 2d 340, 356 (D. Conn. 2011) (collecting cases); *see also Alam v. HSBC Bank USA, N.A.*, 382 F.

App'x 74, 75 (2d Cir. 2010) (summary order) (collecting cases where a proximity of three or

four months was "insufficient").  As such, a period of "over ten months . . . does not allow for an

inference of causation." *Raymond v. City of N.Y.*, 317 F. Supp. 3d 746, 769 (S.D.N.Y. 2018)

(internal quotation marks omitted); *see also Howard v. City of N.Y.*, 602 F. App'x 545, 549 (2d

Cir. 2015) (holding plaintiff "cannot raise a triable of causation given that his protected activity

occurred for" ten months "without any adverse action"); *Johnson v. NYS Office of Alcoholism*,

No. 16-cv-9769 (RJS), 2018 WL 1353258, at *5 (S.D.N.Y. Mar. 13, 2018) (holding that more

than nine months is a "temporal gap that is too remote, by itself, to raise an inference of but-for

causation").

    Next, Plaintiff argues that there is an inference of causation because Plaintiff notified

Moran, her then-supervisor, that the public reports about her were "retaliation for Plaintiff's

complaints about student safety."  (Doc. 13, at 17 (citing Compl. ¶ 33).)  Yet, as DOE notes, (*see*

Doc. 10, at 1), and SCI itself makes clear, SCI is "independent from [DOE]" and "*does not*

report to the DOE or the Chancellor" of DOE.[4]  Plaintiff therefore cannot plausibly argue that

DOE issued or approved these reports as a pretext for its retaliation.  Further, it is irrelevant to

this inquiry whether or not, at the time, DOE was properly informed that Plaintiff subjectively

believed DOE's conduct was retaliatory.  Finally, Plaintiff lists a number of actions that occurred

before the termination of her employment that she believes are relevant to this analysis—DOE's

decision not to retain Reynolds, the investigator; DOE's refusal to act on Plaintiff's complaints;

DOE's purported animus to Plaintiff during her tenure, Moran's refusal to give Plaintiff

additional time to respond to the SCI reports in light of the Jewish holidays, and purported

---

[4] The Special Commissioner of Investigation For The New York City School District, *FAQs*, https://nycsci.org/faqs
(last visited Sept. 13, 2021).

inconsistencies in Plaintiff's termination letters.  (*See* Doc. 13, at 17–18.)  To the extent that Plaintiff is arguing that these are adverse employment actions, this argument must fail because Plaintiff does not plausibly allege that any of these actions materially adversely changed the conditions of her employment.  *See generally Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006) ("A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment.  An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal citations and quotation marks omitted).  If Plaintiff intends to otherwise argue that these allegations are not adverse employment actions but are instead relevant to the causation analysis, I find that they are not sufficiently probative.  If anything, these allegations appear to detract from Plaintiff's claim, given that "an extensive period of progressive discipline" prior to the adverse employment action can caution against the finding of an inference of retaliation. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

In addition, contrary to Plaintiff's representations that DOE provided inconsistent public reasons for her termination, (*see* Doc. 13, at 18, 22), I find that all three of DOE's letters provide a clear and consistent alternative justification for DOE terminating Plaintiff's employment.  In these letters, DOE alleges that Plaintiff (1) used her staff over the years to drive her to the airport, which constituted a misuse of DOE resources and a public servant receiving a private benefit based on her status, and (2) failed to properly execute her job responsibilities and oversee an important project.  (*See* Compl. ¶ 41.)  While "a possible alternative justification for adverse action is not a complete defense to a charge of retaliation," it is still probative because it shows that DOE had multiple, non-actionable reasons to terminate Plaintiff's employment.  *Kiernan v. Town of Southampton*, 734 F. App'x 37, 43–44 (2d Cir. 2018).  Plaintiff suggests that the letters

"provided inconsistent reasons for her termination," which suggests that the reasons were "pretext for unlawful retaliation."  (Compl. ¶ 41.)  But these several justifications are additive, not mutually exclusive, meaning that they are not inconsistent with each other.  In other words, rather than being inconsistent, these facts form multiple reasons for DOE to terminate Plaintiff's employment.

DOE's argument that these letters provide alternative, non-actionable justifications for Plaintiff's termination is bolstered by a disposition submitted as part of a proceeding with the New York City Conflicts of Interest Board, signed by Plaintiff on May 12, 2020.  (*See* Doc. 11-3.)  In this disposition, Plaintiff affirms that "[o]n numerous occasions during [her] eight years as OPT Executive Director, [she] accepted offers from on-duty OPT subordinates to drive [her] in [her] assigned take-home vehicle from the OPT office to LaGuardia Airport to travel to California."  (Doc. 11 Ex. C ¶ 1(e).)  Plaintiff further affirms in the disposition that she "acknowledge[s] that," because of this conduct, she violated multiple provisions of the New York City Charter.  (*Id.* ¶ 1(g–h).)

I believe it is proper for me to consider this disposition because, in deciding a Rule 12(b)(6) motion, a court may consider "documents either in plaintiff['s] possession or of which plaintiff[] had knowledge and relied on in bringing suit."  *Chambers*, 282 F.3d at 153 (internal quotation marks omitted).  Courts "may also take judicial notice of matters of public record." *Reisner v. Stoller*, 51 F. Supp. 2d 430, 440 (S.D.N.Y. 1999).  Even though Plaintiff did not file this document as part of her Complaint and now argues that it is improper for me to consider it, (*see* Doc. 13, at 11), I find that it is appropriate for me to consider both because Plaintiff signed the disposition—thus meaning she had knowledge of the document—and because it is a matter of public record.  The disposition—in which Plaintiff admits to the conduct DOE cited in her

termination letter and that she violated multiple provisions of the city charter—lends further credibility to DOE's alternative justifications for termination.

Regardless, even if I did not consider the disposition, I find that Plaintiff has failed to establish a reasonable inference of a causal connection. As such, Plaintiff has failed to plausibly plead both the first and third elements for a First Amendment retaliation claim, and I must therefore dismiss this claim.

### C.     *Due Process*

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV § 1. "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y.S. Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012). "To state a claim for a violation of procedural due process, [a plaintiff] must allege that she was deprived [of] a protected interest in liberty or property, without adequate notice or opportunity to be heard." *Roman-Malone v. City of N.Y.*, No. 11 Civ. 8560(PAC), 2013 WL 3835117, at *3 (S.D.N.Y. July 25, 2013). Where the benefit is related to employment, a "[p]laintiff must first demonstrate that [s]he has 'a property interest, created by state law, in the employment or the benefit that was removed.'" *Stewart v. City of N.Y.*, No. 11 Civ. 6935 (CM), 2012 WL 2849779, at *13 (S.D.N.Y. July 10, 2012) (quoting *Bernheim v. Litt*, 79 F.3d 318, 322 (2d Cir. 1996)). A plaintiff must then demonstrate that the state actor deprived her of this property interest without affording her due process—in other words, without notice and opportunity to be heard. *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

I find that Plaintiff's claim must fail because she has not alleged any liberty or property

interest at issue.  "[A]n at-will employee lacks a property interest in continued employment." *Segal v. City of N.Y.*, 459 F.3d 207, 216 (2d Cir. 2006).  DOE argues, (Doc. 10, at 10), and Plaintiff does not contest, that Plaintiff was an at-will employee with DOE.  Plaintiff thus has no cognizable property interest in her continued employment with DOE.  Given that this was the only property or liberty interest that Plaintiff has identified, (*see* Compl. ¶ 68), this alone is sufficient to doom Plaintiff's due process claim.[5]

When a party fails to oppose a defendant's arguments in responding to that defendant's motion to dismiss, the claim at issue "is deemed abandoned."  *Komlossy v. Faruqi & Faruqi, LLP*, No. 15 Civ. 9316 (KPF), 2017 WL 722033, at *9 (S.D.N.Y. Feb. 23, 2017); *see also Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 11 (2d Cir. 2020) ("[D]istrict courts frequently deem claims abandoned when counseled plaintiffs fail to provide arguments in opposition at the motion to dismiss stage."); *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018); *City of Perry v. P&G Co.*, 188 F. Supp. 3d 276, 287 (S.D.N.Y. 2016) (dismissing claim as abandoned where plaintiff failed to oppose defendants' motion to dismiss). In its opposition motion, Plaintiff fails to defend its due process claim, respond to any of DOE's arguments on that claim, or even mention its due process claim at all.  (*See* Doc. 13, at 15–18.) As such, "[w]hatever the merit of [DOE's] argument for dismissal," I must dismiss this claim since Plaintiff fails to defend her due process claim.  *Simon v. City of N.Y.*, No. 14–CV–8391 (JMF), 2015 WL 4092389, at *2 (S.D.N.Y. July 6, 2015) (internal quotation marks omitted). Thus, even though I find DOE's arguments meritorious, such a finding is not necessary to dismiss Plaintiff's due process claim because she has abandoned it.

---

[5] DOE spends some time in its memorandum of law arguing that Plaintiff cannot establish reputational harm as a liberty or property interest here.  (*See* Doc. 10, at 10–11.)  However, even liberally construing Plaintiff's Complaint, she does not plausibly allege any such interest, only citing her property interest in her continued employment with DOE.  (*See* Compl. ¶ 68.)  Therefore, I do not address the issue of reputational harm.

I note that instead of defending her due process claim in her opposition brief, Plaintiff appears to introduce a new equal protection retaliation claim.  (*See* Doc. 13, at 15–18.)  Such an equal protection argument is missing from Plaintiff's Complaint, which labels its Fourteenth Amendment count as a "Due Process" claim and alleges a Fourteenth Amendment violation on due process grounds only.  (*See* Compl. ¶¶ 63–71.)  "[I]t is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss," and therefore I decline to consider any new claim that Plaintiff failed to plead in her complaint.  *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 n.1 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (rejecting plaintiff's new claim because it was first introduced in opposition to motion to dismiss).  I must dismiss any potential equal protection claim Plaintiff seeks to argue here in her opposition brief.

## D.    *State Law Claims*

Plaintiff brings this matter under federal question jurisdiction, 28 U.S.C. § 1331, because she brings federal law claims under section 1983 and the First and Fourteenth Amendments, (Compl. ¶ 5).  Plaintiff further asks me to extend supplemental jurisdiction over her New York state law claims under 28 U.S.C. § 1367 because her state law claims "arise out of the same nucleus of operative facts as Plaintiff's federal claims."  (*Id.* ¶ 6.)

A district court "may decline to exercise supplemental jurisdiction over a claim" once it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Lingfei Sun v. City of N.Y.*, 803 F. App'x 469, 473 (2d Cir. 2020) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  "Indeed, when federal claims

are dismissed early in the litigation[,] dismissal of state law claims is appropriate." *Sankara v. City of N.Y.*, No. 15-CV-6928 (VSB), 2018 WL 1033236, at *6 (S.D.N.Y. Feb. 22, 2018) (internal quotation marks omitted).  Here, I have dismissed the only claims over which I had original jurisdiction—Plaintiff's constitutional claims—at this early stage well before trial.  Consequently, I decline to exercise jurisdiction over Plaintiff's state law claims, without prejudice to her re-filing those claims in state court.

### E.   *Leave to Amend*

"In all other cases [other than amendments as a matter of course], a party may amend its [complaint] only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though liberally granted, may properly be denied for:  undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Ruotolo v. N.Y.C.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).

Plaintiff requests that, to the extent I dismiss her Complaint, I permit her leave to file an amended complaint.  (Doc. 13, at 23.)  DOE argues that I should deny such a request, both because (1) any amendment would be futile, and (2) I gave Plaintiff the opportunity to amend her Complaint after DOE filed its motion to dismiss, warning Plaintiff that it was "unlikely that [she] will have a further opportunity to amend."  (Doc. 15, at 7 (quoting Doc. 12).)  I cannot find at this time that any amendment of Plaintiff's would by definition be futile.  And while Plaintiff declined to amend her Complaint when DOE filed its initial motion to dismiss, I find that it would be unduly prejudicial to Plaintiff to dismiss this case with prejudice at this stage where she

has not even filed an amended complaint.  *See generally Rosser v. Sanofi-Aventis*, No. 17-CV-2396 (VSB), 2018 WL 4080351, at *5 (S.D.N.Y. Aug. 26, 2018) (granting plaintiff leave to re-file after complaint was dismissed, in part, "because Plaintiff has yet to amend the Complaint").

This Opinion & Order has laid out many glaring deficiencies in Plaintiff's Complaint. Now with the benefit of Defendant's briefing and this Opinion & Order, I suggest that any amended complaint be tailored to address the deficiencies identified in Plaintiff's initial Complaint, including addressing the disposition that she signed on May 12, 2020, and discussed *supra*, in which Plaintiff admits to at least some of the conduct specified in DOE's termination letters and affirms that she violated several provisions of the New York City Charter.  (*See* Doc. 11-3.)

V.    **Conclusion**

Defendant's motion to dismiss, (Doc. 9), is GRANTED.

Plaintiff's request for leave to amend the Complaint is GRANTED.  Plaintiff shall file an amended complaint within sixty (60) days of the entry of this Opinion & Order.  DOE shall file an answer or otherwise respond to the amended complaint within twenty-one (21) days of its filing.

The Clerk's office is directed to terminate the open motion at Document 9.

SO ORDERED.

Dated: September 22, 2021
       New York, New York

_____
     Vernon S. Broderick
     United States District Judge